Good afternoon, your honors. I also have a difficult name to pronounce, Effie Anastasio, and I'm representing my client, Petitioner Donald Beuke, just like bike. And anyway, I am going to tell you a story about some produce businesses in Salinas, California. These are two separate cases, as you might know. They have different legal issues, but a lot of common facts. Before you tell the story, maybe you can clarify one thing for me. There are two separate cases, and the consequence of the holding by the judicial officer is a suspension for a period for your client, so that he can't do business as a produce broker. Are the two periods, I somehow couldn't pick this up, and I figured it was going to be easier to ask you, how long do those periods run in each of those two cases? Well, it would be a year for each of them. And do they run concurrently? I would assume so. I mean, there's an issue as to when they start, as you know, that's an issue. If you take the USDA's position, if we lost, I would assume what they say is that they would start at the time the decision is rendered, and that they would go for a year. And I'm assuming that they would run concurrently. But I'm not certain. But each one is a year. Each one is a year. And there's no monetary award against your client. No, no monetary award. It's simply he's going to be prevented from doing the only business he's ever done in his life. But in order for you to get effective relief for your client in the sense of no disabling from work for the year period, you need to win both cases.  Okay. That's what I wanted to get straight. Okay. Thank you. Okay. So the story, which I always think that the facts are really important in looking at the law, and sometimes it's hard to get the facts when you're just reading the briefs because you didn't sit through the trials. But I lived through both these trials and am quite familiar with the facts. So let me just lay them out for you. It all started with Mr. Beike's stepfather, Dale Martingale. He started a family produce business in Salinas, California, which Mr. Beike joined immediately upon graduating from high school in 1979. And Mr. Beike started working full-time in this business and did so at, we'll call it, MDC Martingale Distributing Company from 1979 to 2003. Later on, his stepbrothers also joined the business as they became of age, including Wayne Martingale, Shane Martingale, and Bruce Martingale. Mr. Beike's role in the family business of MDC originally started as a produce inspector. But after a short time, he became a produce buyer, buying produce from local growers and selling them to other companies that wanted to buy the produce. And basically, Mr. Beike continued this role as a from the time he initially got it a few years after starting in his family business until he left MDC in 2003. And since that time period in 2003, Mr. Beike has had kind of a sole proprietorship produce broker business where he works with another distributor. They share offices. He works under his license, but just works as a sole broker. Mr. Beike, from the get-go, was never involved in the financial end of the business of MDC. The financial aspects of the business were handled first by his stepfather and then later by his stepbrothers, Wayne and Shane. Also, as is typical in small family businesses, corporate formalities were not observed. Family members handled their designated responsibilities and all functioned well. Mr. Beike never went to corporate meetings, never handled the financial aspects, only really bought and sold produce. This business of MDC continued to thrive and prosper. And Dale Martindale, the stepfather, eventually stepped down around 1999. At about that time, Don Beike, my client, as the titular title of president, but he assumed no greater responsibilities when he got that title than he had ever had throughout the business of MDC. He simply continued to buy and sell produce. His brother... And there's no violation charged with respect to MDC? Absolutely not. And all continued to go well with MDC while Dale Martindale was alive. However, he stepped back a little bit. In 1997, Wayne Martindale, Don's stepbrother, approached him about investing in a new brokerage company he wanted to create on his own, separate and apart from MDC. And that business was to be called Bayside Produce, and he asked Don to invest $7,000 in this business in return for making Don an officer, director, and shareholder in Bayside. Don complied with his brother's request and invested $7,000 in this business of Bayside. And Bayside, for most of its existence, operated out of the MDC offices in Salinas. So it was a separate business operating out of its existence when Wayne Martindale essentially moved most of the books and records out of Salinas to Las Vegas, Nevada. During the entire existence of Bayside, the company was essentially run as if it was a sole proprietorship of Wayne Martindale. Wayne had control of all the books and records. He decided which company. He never shared it with Don. Or later on, there was another person in the business who was a produce salesman as well. They also didn't get financial information. And you indicate it was run as a sole proprietorship, but it wasn't incorporated. It was a corporation, absolutely. But it was But for all practical purposes, it was a company of one. It was a company of one. In other words, Wayne had total control of the books and records, and there wasn't any corporate involvement, board of directors meetings, shareholder meetings, financials. Don invested money in it, but he basically did some part-time sales as if he was a part-time employee. Were all of these entities MDC, Garden Fresh, Bayside, were they all incorporated? Yes. So we're basically dealing with a cluster of closely held corporations, which are essentially within common control of the Martindale family? Correct. Okay. And so this Bayside company then had only two board meetings and shareholder meetings in its entire existence. Basically one when the company was created, and a second time when another person who became a produce salesman out of San Diego, Mr. Kayeski, joined the company. Did the closely held companies use, like, a CPA to file corporate tax returns? Apparently there was a CPA and there was a corporate attorney who basically all dealt with Wayne. Don wasn't involved in any aspects of that. So they did observe the formalities in the sense that they did file annual corporate tax returns, and the attorney made sure that the corporations were annually registered with the Secretary of State and so on. I'm not certain about annual registrations. I know I would assume that if the companies weren't filing tax returns. Were or were not? If they were not, that my client might have been notified, but my client has no knowledge of that. It's just an assumption. I don't mean to get off on a candidate. I just wondered if in the course of the hearing it was established what the structure of all these entities was. Basically what the structure was is that my client, he never even got a share certificate. There was an attorney initially involved in forming both Garden Fresh and Bayside. There were some filings of officers and directors that were done. My client wasn't involved in that. I'm assuming that tax returns had to be filed or else the corporations wouldn't have maintained good standing. But my client wasn't involved in it. And the books and records were kept under Wayne's total control, even to the point of holding on to the stock certificates and not giving them out. And with respect to Bayside, Don's responsibility for that company was to do some part-time produce sales. He stayed a full-time employee of MDC and then he bought produce. Mainly for one customer. I thought that the, I'll call him the hearing officer, found that there were some produce buys that your client was involved in for both businesses. Well, I'm just talking about Bayside now, but I'll talk about Garden Fresh in a minute. I was trying to keep them separate because they're two real kind of separate entities because Bayside was run out of Salinas and Garden Fresh was run out of Nevada. During what period of time? I thought you'd indicated earlier in your presentation that Mr. Martindale, I guess it's Wayne, had moved to Las Vegas from Salinas. He eventually did later on toward the demise of the companies and the Garden Fresh, the Bayside entity was started first in 1997. The Garden Fresh entity was started second in year 2000. The Bayside entity operated in shared offices with MDC and Salinas. The Garden Fresh entity was always in Las Vegas, Nevada and never had an office in Salinas. And so while Bayside was in Salinas, apparently throughout Bayside's existence until the very end, Mr. Beike did do some produce buying for Bayside. And with respect to Garden Fresh, he only did a small amount of purchases at the very beginning. And there was an issue with respect to the hearing officer regarding whether there were some purchases that he made within the timeframe of the violations. And the produce, the people that were owed money, the produce companies that were owed money all testified that they did not do business with Don. But apparently there was some vague testimony of one witness. I haven't even read it in that second day of hearing where we weren't permitted to be there. And that was where the one, there was some reference about Don buying for Garden Fresh within the last year of existence. So are you telling us that even though the corporate formalities may or may not have been followed, that basically the way these folks operated was that your client had a certain number of customers or brokers that he, or producers that he normally brokered sales for, and then his stepbrothers and stepfather had other producers and customers for whom they brokered produce? Well, this is, I guess you have to treat them each separately. First there was MDC, and MDC, I believe that there were several brokers. It was a larger organization. And Don was one of the produce buyers for that organization. And that had its own separate books and records. And that was really under his father's, stepfather's control, and his stepfather's entity really until he retired, but his stepfather was really involved with it until he died. Then there was Bayside, which was a separate entity that Wayne formed. And Wayne was the one that was really controlling Bayside from the get-go. And if you look at the testimony of every single produce person that testified in the hearing, they all said that Wayne was the person that was in control, Wayne was the one that looked to for payment, Wayne was the one that had control of the books and records. But the picture that you're painting for us, and please correct me if I'm getting the wrong impression, sounds like you had all of the family members at some point working out of a common office in Salinas. Correct. And they all came to the same place every day, but some of them handled transactions for certain customers and others handled transactions for other customers, and they didn't really differentiate by corporate form who they were doing business for. They were just brokering lettuce and fruit and potatoes and whatever else they were selling. Yeah, they were, at MDC, yes, they were just brokering, but MDC had its own separate books and records. So MDC had its own separate books and records, it was brokering fruit and lettuce, et cetera, and there were family members that were in charge of the financial aspect of that, and it wasn't Don. So were customers allocated by company? I'm still trying to figure that out. Yes, yes. In other words, MDC, just because MDC and Bayside operated out of the same office, they were totally different operations as far as if a produce order was a Bayside order, it would be on a Bayside ticket. If it was an MDC order, it would be an MDC ticket. If that's the case, then why would the customers of Bayside call your client when they weren't getting paid, the producers who supplied goods? Okay. You have to realize, and you'll see this if you read through the testimony, that most of these people all did business with MDC, with Garden Fresh, with Bayside. In other words, there's, you know, a certain amount of producers in Salinas, and you go to them to buy produce, and then you have different customer accounts. And so as far as buying the produce, you buy, you know, there's only so many people that sell lettuce, and so MDC buys from them, Garden Fresh buys from them. Can I interject? Sure. And I think, again, I'm just trying to get the picture, as Judge Tom is trying to get the picture, these growers know your client, Don. They know he's connected with both MDC and with Bayside, and so when Bayside starts not paying, they say, well, I'm calling Don, because, I mean, they know each other, and so they know that he's the guy who may be able to fix their problem. Is that right? Well, basically they call Don, they know Wayne is his stepbrother, and they call Don because Wayne is his stepbrother, and they know Don, you know, knows Wayne. And where's Wayne? Is he in Salinas? No, he's not in Salinas. He's gone to Las Vegas. Can you get a hold of Wayne? I'll try to. And you have to understand, the reason why I say it's important to understand the context is that this business, they've all been operating in this business for almost, you know, 79, 89, 99, you know, for over 20 years, and people trust each other, so everybody trusts Wayne, including Don. They all believe he's going to operate business as usual, and then all of a sudden, boom, at the end of 2002, his father dies, who's very close to, apparently it hit him hard. He's moved to Las Vegas. He apparently acquires a gambling persona, drug problems, spousal abuse. Nobody in Salinas really knows this is going on. It's all happening kind of out of the way. Don doesn't know, nor do any of these other people know, and all of a sudden, boom, they're not paying their bills. And Don tries to follow up about it, and it's his stepbrother. I mean, he isn't just, if he had just cut out and walked away, the minute he heard about problems, he may have been able to avoid liability, but he tried to resolve it. But in essence, he never had control of the books and records. He never had control of the money to pay these people. With respect to the Garden Fresh entity, he had almost no involvement whatsoever, other than he signed one check when the company started up, and executed a couple of resolutions, and he was extremely titular in nature. What about the 22 or 29 checks that he wrote for Bayside? Well, with Bayside, what happened is that once Wayne had moved to Las Vegas, and the bookkeeper talked about it, that because he wasn't there, because the checks were being printed out of the computer in Salinas, he would direct the checks be printed, and have them there, and then have them ready. My time's up. Should I just... Okay. And so what happened is that because Wayne was out, and there was testimony of the bookkeeper as to how that happened, that he would direct that certain checks be done, and that Don was there to sign the checks, only has directed and printed and told to the bookkeeper, these are the checks that I want Don to sign. And so because Bayside was run out of MDC's office, Don was used as a convenience in that respect. And then the awful thing about this, I just want to say one thing to sum it up, is if you look through the transcript, every single one of these people in the produce business say that they do not blame Don for what happened, they feel that he's a man of unimpeachable character, he's very honest, they continue to do business with him, and what's happened here is really a tragedy. And Don has tried to make things right, and actually, as I laid out in my brief, with respect to these responsible connected proceedings, never even had the opportunity to settle because of the procedural posture he found himself in. Why don't we hear from the government, and we'll give you a chance to respond. Thank you so much. May it please the Court, my name is Leslie Lagomarsino, I represent the Secretary of the Department of Agriculture. As we've just heard, Mr. Beike was the president of Martindale Distributing Company. He established two additional independent produce companies, Bayside and Garden Fresh. Well, I'm not sure he established, he was in on the establishing with others. He and Wayne Martindale together decided that they were going to establish two independent companies. Mr. Beike's name appears on the incorporating documents, his name appears on the PACA license applications for both corporations, his name appears on the bank account for both statements, the lines of credit, his name appears on all official documents establishing these corporations. He comes now before this Court essentially to say, well, none of that matters, even though he's represented himself to the States and to the United States government, to his customers, as a responsible official of these corporations. In fact, he wasn't. Now, can I ask you the same questions as a preface, as I asked the other side? We've got one-year suspensions on each of these two cases, is that correct? That's right. It's an employment bar. He's prohibited from working in the business for one year. Yeah. And assuming that we affirm on both, do they run concurrently? Both cases have been stayed pending the outcome of this appeal, so, yes, they would start to run with this final decision concurrently. Concurrently. Yes. That is to say, if he loses one of these cases, he's barred for a year. That's correct. If he loses both cases, he's barred for a year. That's correct. And your position is, if he loses, the one-year bar starts to run from the time our decision is final? That's right. Okay. He's barred, but he can continue to work if he gets a bond? Is that how it works? He's barred for the first year, and the second year he can work if the company he's working for posts a surety bond. How big does the bond have to be? The bond is determined by the secretary, and it's based upon the size of the business who's hired him, how much produce he may be handling. And so we don't know who he would be working for in the second year? That's right. It would be a reasonable bond is the way the regulations read, and it's determined by the size of the business and how much produce he'd be handling. The Perishable Agricultural Commodities Act does not provide an escape hatch for an officer or director or shareholder of a corporation who simply turns his back on his corporate responsibilities. In this case he was trying to pay these debts. He was trying to pay the debts? The brother-in-law ran off with the money, figuratively speaking at least, and this gentleman is trying to pay some of it off, work with it to get some of the creditors paid. And that's part of what got him in trouble, because he was signing checks and things like that to try to get some of the creditors paid. Well, that's right. Didn't I see that in the record? He was. He was signing checks for Bayside. He actually signed 20 checks during the period that Bayside committed its violations. I think it's important to keep in context that Bayside was found in violation of the PACA for failing to pay 22 produce creditors $163,000 between the periods of November 2002 and February 2003. Garden Fresh failed to pay five creditors almost $400,000 between the periods of January 2002 and February 2003. Mr. Beike became aware that these companies were in financial distress about the middle of 2002 when he started receiving calls from creditors wanting to know why they hadn't been paid. And at that time, he tried to contact Mr. Martindale and had varying levels of success. He did manage to get in touch with Mr. Martindale and discuss the possibility of getting more produce suppliers to help fund the company's deficits. After the period, however, that he knew that the companies were in distress, he continued for Bayside to purchase produce, thereby incurring further debt. And I believe it was 33 of the purchases that he made during the time period of the violation. Those creditors were never paid. For any of the purchases that he made, did any of those result in the growers being stiffed? Yes, 33 of the purchases that he made for Bayside during the violation period resulted in the purchase of produce. What's the Secretary's position as to what he should have done when he found out about it, assuming he was in good faith up to that point? When he found out about it, he could have examined the records. He could have directed Wayne Martindale to stop making purchases, further purchases. He himself could have stopped making further purchases. He essentially did nothing. He didn't go to... Well, no, that's not true. He did quite a few things. In the end, it was not fully successful, so we end up with some growers not being paid. But you can't say he did nothing. Well, he did not. Let me step back and talk to you about the standard, the responsibly connected standard that kind of guides the discussion. The Perishable Agricultural Commodity Act says that a director, an officer, and a shareholder of a company that fails to pay its creditors is responsibly connected to that corporation and therefore subject to the employment bar. When the officer meets that statutory definition, the burden then switches to him to come forward and show by a preponderance of the evidence that he was not actively involved in the corporation, and he must also meet the second prong of the test and demonstrate that he was only a nominal director. The way the Secretary interprets this, it sounds as though in operation it can almost be a strict liability statute. That is to say, if you're involved, as Mr. Beike was, and yourself, I mean, as far as I can tell, there's one bad guy here, and that's Wayne, who's got a drinking problem, maybe a drug problem, maybe a gambling problem. He's got all kinds of problems, and he's taking money out of the corporations that he shouldn't be taking out. There's no allegation whatsoever that Mr. Beike is doing this. When he discovers that we've got problems, he tries to fix it, but it turns out they're not fixable. But because he is, in the view of the Secretary, sufficiently connected with the company, none of this matters, that he's innocent in a sense, he's also a victim, he's just stuck. I mean, is that the way the law is supposed to operate? It's a very harsh statute. Congress stated it's a harsh statute. It was put in place to protect the sellers of produce who are dealing in perishable commodities and are stuck if they don't get paid. So there's no question that it's a stark, a harsh result, but it's the result that Congress intended. But listen, let me ask you this. What if at the first sign of trouble, when the first phone call comes in that says, you know what, Wayne hasn't paid me, he makes a phone call and somebody tells him, you know, Wayne was down at the Golden Nugget and he dropped $100,000 last night, if at that point Mr. Beike had said with respect to both Bayside and Garden Fresh, I'm out of here, and he gets served personally on everybody in town, I'm out of here, I have nothing more to do with these things, I resign, here are my shares, I'm gone, as of right this second, would he be a responsibly connected party in the view of the Secretary? If he had resigned his positions and walked away, I think it would be a closer call whether he was responsibly connected. But under your view, because he stayed and tried to make things right, he's now on the hook. Well, he's on the hook because he meets the statutory definition of responsibly connected, and he was not nominal. The statute sounds, and the way that's described, that sounds not only harsh, but in a way counterproductive. If he can save himself from the bar by walking away as soon as there's the first sign of trouble, instead of trying to stick around and fix it. Well, it was the time, the relevant time period is the time period of the violations. And if he had been purchasing produce as he was during the periods of the violations, then under the statute he would be responsibly connected. Is this any different from the liability that we impose under ERISA for responsible officials of a pension plan? I'm sorry, Your Honor, I'm not familiar with that. You don't know ERISA law? I think the answer is it's just as harsh. If you are a fiduciary of an ERISA plan, you have an absolute liability to make sure that the beneficiaries get paid. And it seems that in the hypothetical that Judge Fletcher was asking, if Mr. Bykey was actively involved in the sales and the suppliers of the produce don't get paid, at that point there's nothing he can do under the PACA statute to absolve himself of liability as responsibly connected, no matter what he does. Well, I think that that's right. It's not an absolute liability statute. It was prior to the 1995 amendments, and Congress decided at that time that it shouldn't be, that that was too harsh, that you should provide an opportunity for the officer to come forward and show by a preponderance of the evidence that he was not actively involved during the time period of the transactions or that he was. But in my hypothetical, the transactions have already occurred. The lettuce has been acquired, and it hasn't been paid for. And he's up to his eyeballs in arranging those transactions. Absent full payment to the supplier, when they start screaming for payment, there really isn't anything he can do. I mean, he can take all the trips to Las Vegas he wants, but he might be better off spending it at the casino table and hoping that he can win some money to pay the supplier. One thing that he could do under the secretary's policy is make arrangements for full payment of all of the creditors. Try and go out and get a loan from a bank or something to pay. Right. And if within 120 days of the disciplinary action being filed against the company, if he had come in and made certain that all of the creditors were paid in full, then the sanction would not have been revocation of the PACA license, and therefore the employment restrictions wouldn't have kicked in. It would have, at that point, become a slow pay case rather than a no pay case. And the ‑‑ What does that mean? Well, it's a late payment. Late payment to the suppliers. And you get dinged for that, too, right? Because the statute wants immediate payment. The statute requires full and prompt payment. But in the eyes of the secretary, if it's a slow pay case, you're still not out of the woods for some kind of regulatory action. That's right. Even if you make late payment, then the sanction is less. Rather than a license revocation, it's a license suspension, and for the purposes of being responsibly connected, those employment bars don't take effect. But that didn't happen in this case. So there are some suppliers out there who still have not been paid. That's right. And do we have a dissolution or a bankruptcy with both Bayside and Garden Fresh? I'm trying to figure out, are they never going to get paid? Well, neither company has applied for a PACA license. So as far as the Department of Agriculture is concerned, neither is in business. I'm not sure if they've ‑‑I don't know if they've filed for bankruptcy. Well, usually you don't know. Mr. Beike has raised several other procedural issues relating to the Jenks Act and documents that weren't provided to him. He's raised some issues regarding notice to him. I think these are arguments that are without merit. He has ‑‑well, and I guess he's also raised the issue of when the sanction begins to run. I think it's our ‑‑ we would say since the proceedings have been stayed pending Mr. Beike's pursual of all of these appeal procedures, that the sanction would begin to run at the end. You know, I'm not sure it makes any difference the way I'm going to vote on the ultimate outcome, but I do think there's something odd about having a proceeding against Mr. Martindale in which evidence is presented that's relevant or could be relevant to Mr. Beike. He's not permitted to participate, and then testimony and evidence coming out of that is used against him. That doesn't seem right to me. Well, Mr. Beike was not prohibited from attending the hearing. Was he allowed to cross-exam? Well, there was confusion on the record. The administrative lodger certainly considered that both of the proceedings were independent and severed, and he did close the hearing at the end of Beike's testimony. He did not bar Mr. Beike from attending the second day. So he can watch his ship sink, but he can't bail. He could have ‑‑ this is hypothetical. He could have come the next day and watched, and I don't know what would have happened if he had asked. Watching somebody else do something, I mean, if I'm a party, I've got my own purposes, I testify in a certain way and so on, and if nobody questions me, even though it may be a liar, very self-serving, well, okay, there it is. And obviously we've got some conflict of interest between Martindale and Mr. Beike. Again, I want to say I'm not sure this influences my ultimate outcome, but it does not seem to me fair or right that if there's a proceeding against Mr. Martindale in which Mr. Martindale is testifying adversely to Mr. Beike, that that testimony can be used against Mr. Beike when Mr. Beike had absolutely no opportunity to intervene to cross-examine or present his own evidence. That just doesn't seem right. Well, and that was the position of the administrative law judge who had ‑‑ who felt strongly that the testimony of Mr. Martindale should not be used against Mr. Beike. The judicial officer stated in his decision that he was perplexed by the situation, but he looked at the rules, and the rules require that these proceedings be joined, as he assumed that the rules were governed. I think that if you decide that it was unfair and that the testimony of Mr. Martindale shouldn't be considered, that that still doesn't affect the outcome of the case. But I understand that there ‑‑ and it was acknowledged in the record that there was confusion about the way the proceedings were handled. Does it make any practical difference to Mr. Beike as to whether or not he loses on both or loses only on one? Let us say we have this problem only with respect to Garden Fresh. Does it make any difference to the Secretary as a practical matter whether ‑‑ As a practical matter, it will be ‑‑ he will be prohibited from employment for one year, so that it's ‑‑ So it's not two black marks is for practical purposes the same as one black mark. Right. Okay. Unless you have other questions. Thank you. Thank you. We'll give you an opportunity to respond, please. Okay. Thank you. Why don't we start with two minutes and see what happens. Yeah. I just wanted to respond to a couple of the factual issues that you raised. First, with respect to payment of the Bayside creditors, there's in the record the fact that Mr. Beike paid $85,000 to the Bayside creditors in connection with settling a separate lawsuit that they brought in federal district court, and he was absolved of liability to them from the point of view of civil liability in court. Okay. So they compromised their $400,000 claims for $85,000. Well, there was $85,000 from him, and then they got some from some other people, but $85,000 from him they compromised and totally released him. But I heard opposing counsel say that in the eyes of the Secretary of Agriculture that that would then be considered, I guess, a slow pay situation. If it was even timely for slow pay, I don't know the regs. Well, I think there's two separate issues, just so you understand. There's federal district court where PACA people bring claims to get money, and then the responsibly connected proceedings, which really aren't meant to gather money per se for the PACA creditors, but a disciplinary proceeding. And so, anyway, after Mr. Beike paid, he took out a loan and paid these people, he also tried to go to the USDA and say, what can I do to settle the claims that are affecting the disciplinary proceeding, I'd like to settle those. And just so you understand, the USDA policy is that once they've gone through a certain point in their proceedings, that you can't settle. And he offered to settle in full, and they would not let him. And people in Salinas actually are just totally miffed. I think it just stands the statute on its head to say that you aren't able to settle up after the fact and prohibit an employment. But isn't the problem with this whole statute that we're dealing with perishable commodities, let's take lettuce. You can only store the lettuce for so long, and if the lettuce has been delivered to an ultimate customer, the supplier can't get the lettuce back from the person who didn't pay him for it, because by then it's spoiled. Right, but that doesn't mean, it's also, but they still have the debt. In other words, the fact that the lettuce is gone, if the lettuce was worth $30,000, there's still $30,000, and I think I've actually talked to a lot of people in Salinas, and I mean, they would like their $30,000 a year later or two years later. Rather than nothing. But the congressional purpose here is to get them paid very promptly. It's to get them paid very promptly, but then to say that we are never, if once a certain statutory time frame goes by, and that's why we say that the whole responsibly connected proceedings where we didn't have notice of the reparation proceedings and weren't involved and didn't, our client didn't know that those could affect his rights to earn a livelihood, are a due process issue, and I don't think anybody has really raised that, per se, before. Another item I'd like you to note is that the responsibly connected statute requires involvement in the process and that if there is involvement in the transaction, it must show that participation in the transaction resulting in the violation. Well, you've got to show no participation and no, more, and only nominal. You've got to show those two things. Right. And so with respect to the Bayside situation, just so you understand, Don did not actually contribute. I mean, Don did buy produce that wasn't paid for, but his client that he sold the produce to, the produce people, paid all their bills. So Bayside got money from that, those sales. Those didn't contribute to the downfall of the company, it was Wayne taking the money, not Don making the sales. Okay. You're over 30 seconds to wrap up. Okay. It was the end of 2002, not the middle, if you look at the record. And with respect to the hearings, there was no confusion about having separate hearings in the Garden Fresh. That was the way we set it up with the administrative law judge. He closed the evidence. We went, I mean, he said the evidence is closed. I mean, there was no issue about us sticking around the second day of hearing or anything like that. It was separate hearings. That's the way they were set up from the get-go. And the reviewing judge used evidence from that second hearing in order to find Mr. Beike responsibly connected. Thank you very much for your time.
judges: Fletcher, Tallman, Bertelsman